**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

TODD S. HOKE,

                                    Plaintiff,

                    v.                                              No. 14-CV-663
                                                                    (GTS/CFH)

CAROLYN W. COLVIN, Commissioner
of Social Security,

                                    Defendant.

_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**


**APPEARANCES:**                          **OF COUNSEL:**

Law Offices of Steven R. Dolson          MAGGIE W. McCOMBER, ESQ.
126 North Salina Street, Ste. 3B
Syracuse, New York 13202
Attorneys for the Plaintiff

Social Security Administration           ANDREEA L. LECHLEITNER, ESQ.
Office of Regional General Counsel,      Special Assistant U.S. Attorney
Region II
26 Federal Plaza - Room 3904
New York, New York 1278
Attorneys for the Defendant


**REPORT-RECOMMENDATION AND ORDER**[1]

        Plaintiff Todd S. Hoke ("Hoke") brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a decision by the Commissioner of Social Security ("Commissioner") denying his

application for disability insurance benefits ("DIB") and supplemental security income ("SSI")

under the Social Security Act ("Act"). Hoke moves for a finding of disability, and the

_____

        [1]   This matter was referred to the undersigned for Report-Recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Commissioner cross-moves for a judgment on the pleadings.  Dkt. Nos. 11, 13.  For the following reasons, it is recommended that the Commissioner's determination be affirmed.

## I.  **Background**

### A.  **Facts**

Hoke was born on October 4, 1960.  Dkt. No. 9-2, at 34.[2]  Hoke was 49 years old on the alleged disability onset date of January 1, 2010.  Id.  Hoke suffered a gunshot wound to his right hip in 1987 which broke his femur and necessitated various surgeries.  Id. at 37.   He explains that he was able to work, although it "would take [him] 45 minutes to an hour to get [his] legs right just to be on the job."  Id.  Eventually, Hoke developed "arthritis going up to [his] hips in both [legs] because [he] compensate [sic] with [his] left leg because [his] right leg over a period of 25 years – [his] left hip was starting to bother [him].  The left thigh locks up and [his] knee."  Id. at 38.  He explained further that his left thigh "locks up and it gets knots in it and . . . the kind of cramps that just make you want to stop walking . . . [a]nd it's affecting [his] knee."  Id.  He "focused on the right side and this left side [was] doing real good for 25 years . . . and now it's paying for it, too.  [He] feels electricity, it's like strands going up through [his] legs and hips every day."  Id.  Hoke explained that he could "probably" walk for about forty-five minutes, but will need to "stop and  . . . stretch [his] legs and . . . [his] hips really bother [him], especially with this cold outside."  Id. at 39.  Hoke suffered a self-inflicted stab wound to his abdomen in 2001.  Dkt. No. 9-7, at 3.  Hoke takes Neurontin for arthritis and "for the mental too."  Dkt. No. 9-2, at 39.  He also takes Topamax and another medication for anxiety.  Id.

---

[2]  Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

Hoke attended high school until the tenth grade, and thereafter obtained his G.E.D.  Id. at 35.  He attended college briefly, but did not complete his first semester and did not obtain any credits.  Id. at 36.  He worked as a mason from 1995, earning $24.78 per hour, until he was "laid off" in May 2009.  Id.; see also Dkt. No. 9-6, at 8.  Hoke has one adult daughter and is not married.  Dkt. No. 9-2, at 34.  At the time of the hearing, Hoke was homeless and residing at the Capital City Rescue Mission in Albany.  Dkt. No. 9-2, at 35.

## B.  Procedural History

On October 19, 2011, Hoke filed a Title II application for a period of disability and disability insurance benefits and protectively filed a Title XVI application for SSI claiming an onset date of January 1, 2010.  Dkt. No. 9-5, at 2-29.  He alleged that he suffered from lumbar spine impairments, right hip trochanteric bursitis, major depressive disorder, and anxiety disorders.  Dkt. No. 9-6, at 7.  Those applications were denied on January 17, 2012.  Dkt. No. 9-4, at 6-8.  On January 24, 2010, Hoke filed a written request for a hearing.  Dkt. No. 9-4, at 4.  A hearing was held before Administrative Law Judge ("ALJ") Carl E. Stephan on November 27, 2012.  In a decision dated February 15, 2013, the ALJ determined that Hoke was not entitled to disability benefits.  Dkt. No. 9-2.  Hoke timely filed a request for review.  Dkt. No. 9-4, at 4-5.  On May 8, 2014, the Appeals Council denied Hoke's request, finalizing the ALJ's determination.  Dkt. No. 1-1, at 1-4.  Thereafter, Hoke commenced this action.  See Compl.

## C.  Examinations and Consultations

### i.  Physical Examinations

Dr. Richard A. Alfred, orthopedist, performed surgery on Hoke's right thigh in 1987 or 1988. Dkt. No. 9-6, at 11. Dr. Alfred saw Hoke in April 2005 with right lateral hip pain. Dkt. No. 9-7, at 9. Dr. Albert concluded that Hoke had trochanteric bursitis, and provided a Kenalog and Lidocaine injection. Id. Dr. Albert saw Hoke again in November 2007 with discomfort in the area of the greater trochaneter; a Kenalog and Lidocaine injection was provided. Dkt. No. 9-7, at 6 Dr. Alfred's "impression [was] a synovitis of the knee" and he recommended Kenalog and Lidocaine injections. Id. at 6. Examining Hoke's right thigh, Dr. Alfred noted tenderness in the greater trochanter and well-maintained motion of the hip, and concluded that Hoke had trochanteric bursitis. Id. Hoke saw Dr. Alfred for "re-evaluation of his right hip" on March 19, 2009. Dkt. No. 9-7, at 3. Dr. Alfred ordered an X-ray of Hoke's hip which revealed "a well healed fracture with Synthes nail present." Id. Dr. Alfred again concluded that Hoke suffers from "trochanteric bursitis." Id.

In November 2011, Hoke presented to Dr. Padmaja Madala for a triage visit. Dkt. No. 9-7, at 37. Hoke complained of "right leg pain from the knee up to his thigh/hip area" that "goes around his back to the top and thigh of his left leg." Id. Hoke told Dr. Madala that he "went to DSS to apply for SS Disability and was told he needs a PCP to see him for this issue" and that he was told that "he needs to see a Rheumatologist as well." Id.

Dr. Anjum Iqbal performed a consultative examination of Hoke on March 12, 2012 for Hoke's complaints of bilateral leg pain with difficulty with standing and walking. Dkt. No. 9-7, at 82. After consulting with Dr. Iqbal, plaintiff underwent a series of steroid injections. Id. at 82-83.

Dr. Syed Hasan examined Hoke on June 8, 2012, July 20, 2012, and some time in August of that year. Dkt. No. 9-7, at 258-71. He also provided a Medical Source Statement.

Id. at 239-42.  Dr. Hasan performed a Therapeutic right L4 selective nerve root block (#1).

Id. at 63.  Dr. Hasan noted decreased range of motion in Hoke's hips as well as moderate to

marked lumbar tenderness.  Id. at 71.  Further, Dr. Hasan observed that Hoke's lumbar range

of motion was reduced by twenty-five percent, extension reduced by seventy-five percent, and

lateral flexion decreased by fifty percent.  Id. Dr. Hasan also noted that, during the exam, Hoke

had "rather unsteady gait due to imbalance." Id. at 71, 74.  However, he noted that Hoke "was

able to perform heel and toe walk without much difficulty" and "squat . . . up to 25%." Id. at 74.

Dr. Hasan concluded that Hoke's lower back pain was "likely due to lumbar spondylosis and

bilateral L4 and L5 radicular involvement secondary to the disc bulge and the lumbar spinal

stenosis." Id. at 75.  He further opined that Hoke appeared "to have superimposed symptoms

caused by the sacroiliac joint dysfunction and the posttraumatic osteoarthritis of the right hip"

which are "compounded by the marked soft tissue tightness particularly involving the bilateral

hamstring, history of substance abuse, and the mental health issues." Id.

Dr. Hasan concluded that Hoke was moderately limited in walking; standing; sitting;

lifting; carrying; pushing; bending; stairs/climbing; maintaining socially-appropriate behavior;

grooming; and functioning in a work setting at a consistent pace.  Dkt. No. 9-7, at 47.  However,

Dr. Hasan noted no limits in Hoke's use of his hands; understanding, remembering, and

carrying out instructions; maintaining attention and concentration; making simple decisions; and

interacting appropriately with others.  Id.  He limited Hoke to lifting, pushing, or pulling up to

twenty pounds and standing or sitting for an hour at a time.  Id.

Dr. Jose Corvalan performed a consultative orthopedic examination of Hoke on

December 12, 2012.  Dkt. No. 9-27, at 11.  Dr. Corvalan observed that Hoke appeared to be

in no acute stress during the examination.  Id. at 12.  Hoke ambulated with a cane, favoring the

right side. Id. He was able to walk on his heels and toes "with some difficulty" and squat to approximately seventy degrees. Id. Dr. Corvalan noted that Hoke's "[s]tation is maintained with a cane. [Hoke] used the cane for part of the examination. It is not clear if it is medically necessary at this point." Id. at 12-13. Dr. Corvalan observed that Hoke "[n]eeded no help changing for the exam or getting on and off exam table. [He was a]ble to rise from chair without difficulty." Id. at 13. Hoke had full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally. Id. Further, he had "[n]o cervical or paracervical pain or spasm. No trigger points." Id. Dr. Corvalan noted "no limitation with ROM in the upper extremities." Id. He had "full ROM of shoulders . . . elbows, forearms, wrists, and fingers bilaterally." Id. Hoke had "[n]o joint inflammation, effusion, or instability." Id. Strength was" 5/5 in proximal and distal muscles." Id. Hoke had no muscle atrophy, sensory abnormality, and his reflexes were physiologic and equal. Id. Examination of Hoke's lumbar spine revealed 70 degrees flexion and extension, and 30 degrees extension bilaterally, and thirty degrees of lumbrosacral rotation extension, bilaterally. Id. at 23. Dr. Corvalan noted that Hoke wore a lumbar brace and used a cane "during part of the examination." Id. He noted no trigger points. Id.

Dr. Corvalan concluded that Hoke had low back pain radiating to the right lower extremity, left knee pain, history of fracture of right femur and right hip, and history of depression. Dkt. No. 9-27, at 14. The doctor gave Hoke a "[s]table" diagnosis and concluded that he has "mild limitation for sitting and standing for long periods of time, walking long distance, bending, squatting, climbing stairs, and kneeling. This is due to low back pain and left knee pain. This is a mild limitation." Id.

In his Medical Source Statement, Dr. Corvalan concluded that Hoke could lift/carry up to ten pounds frequently and twenty pounds occasionally. Id. at 15. Dr. Corvalan further

opined that Hoke could sit, stand, or walk for up to one hour at a time in an eight hour work day, totaling of up to six hours each, alternating between sitting, standing, or walking in an eight hour work day. Id. at 16. The doctor stated that Hoke had mild limitation on the use of his feet and could frequently operate foot controls with both feet. Id. at 17. Hoke could occasionally climb ladders and scaffolds, as well as kneel and crawl. Id. at 18. He could frequently climb stairs and ramps, balance, stoop, and crouch. Id. Dr. Corvalan concluded that Hoke did not need a cane to ambulate. Id. at 16. Finally, Dr. Corvalan opined, among other things, that Hoke's physical impairments did not keep him from caring for his personal hygiene, walking a block at a reasonable place on rough or uneven surfaces, or performing activities such as shopping. Id. at 20.

Consulting examiner Dr. Suraj Malhotra performed a consultive orthopedic examination on November 14, 2011. Dkt. No. 9-7, at 27-30. Dr. Malhotra concluded that Hoke had full range of motion in his lumbar spine; full range of motion on his left side; right hip range of motion limited to 80 degrees flexion/extension; 40 degrees interior rotation; 40 degrees exterior rotation; and 25 degrees of backward extension. Id. at 29. Dr. Malhotra noted no shortening of the legs, despite Hoke's claim otherwise. Id. Dr. Malhotra concluded that Hoke's prognosis was good. Id. In his medical source statement he concluded there was a mild limitation in squatting and minimal limitation in bending the right hip and right knee. Id. at 30. Dr. Malhotra noted that Hoke's gait and station were normal, and that he could walk on heels and toes without difficulty. Id. at 28. Dr. Malhotra noted further that Hoke used a cane for instability, but did not consistently use the cane during the evaluation. Id. Dr. Malhotra opined that the cane "[m]ost likely . . . is not medically necessary." Id. Finally, Dr. Malhotra observed that Hoke "[n]eeded no help changing for the exam or getting on and off the exam table" and that he was

"able to rise from chair without difficulty."  Id.

Dr. M. Mayer performed a consultative examination on January 10, 2012.  In a Physical Residual Functional Capacity Assessment, Dr. Mayer concluded that Hoke could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand and/or walk with normal breaks for about six hours in an eight-hour work day, sit with normal breaks for six hours in an eight-hour work day; and unlimited pushing and/or pulling.  Dkt. No. 9-6, at 28.  Dr. Mayer reported that Hoke could climb ramps or stairs occasionally, stoop and kneel occasionally, but never climb ladders/ropes/or scaffolds/or kneel, crouch, or crawl.  Id. at 29.  Dr. Mayer agreed that Hoke "has MDI which would cause some functional limitations as given in the RFC herein[;] however[,] [Hoke] states that he is able to shower, bathe and dress himself, cook simple meals for himself, do dishes and take out trash – one bag at a time, walk and use public transportation."  Id. at 31.  Dr. Mayer "assess[ed] [Hoke]'s statements to be credible and attributable to the MDI but not to the degree alleged."  Id.

## ii.  **Mental Examinations**

Hoke's treating therapist, Raju Sadal, P.A., from Vitality Physicians Group Practice P.C. provided a statement on June 11, 2012, after he had been treating Hoke for three months.  Dkt. No. 9-7, at 45.  Sadal stated that Hoke is "very limited" in his ability to maintain socially-appropriate behavior, interact properly with others, maintain basic standards of personal hygiene and grooming, or function in a work setting at a consistent pace.  Id.  Sadal concluded that Hoke had no limitations on seeing, hearing, speaking, using his hands, understanding and remembering instructions, carrying out instructions, maintaining attention/concentration, making simple decisions, and interacting appropriately

with others.  Id. at 47.  Further, Sadal concluded that Hoke is moderately limited in understanding, remembering, and carrying out instructions; maintaining attention and concentration; making simple decisions; maintaining basic standards of hygiene and grooming, and functioning in a work setting at a consistent pace.  Id. at 45, 47.  He further concluded that Hoke had moderate limitations in walking, standing, sitting, lifting, carrying, pushing, pulling, and bending.  Id. at 47. Sadal provided a diagnosis of (1) major depressive disorder; (2) post-traumatic stress disorder; and (3) generalized anxiety disorder, and noted that he is on medication for all three conditions.  Id. at 43-44.  Treatment notes from Vitality Physicians Group show that Hoke's Global Assessment of Function Score ("GAF") was tested to be between 65 and 70.  Dkt. No. 9-24, at 4.

Brett Hartman, Psy. D. performed a consultative psychiatric examination on December 12, 2012.  Dkt. No. 9-27, at 348-55.  Hartman noted that Hoke's attention and concentration appeared mildly impaired and that Hoke "could do the counting without difficulty and . . . performed fairly well with the calculations and serial 3s."  Id. at 5.  Hartman concluded that Hoke's recent and remote memory skills also appeared mildly impaired – "[Hoke] could recall 4 out of 4 objects immediately and 2 out of 4 after five minutes.  He could perform 7 digits forward and 5 backward."  Id. at 6.  His cognitive functioning "appeared to be near the average range with a nearly average general fund of information."  Id.  Hoke's insight and judgment were reported as fair.  Id.  Hartman was "able to follow and understand simple directions," had "a fair ability to maintain attention and concentration," "maintain a regular schedule," and "learn new tasks."  Id.  Hartman further concluded that Hoke "is likely to have problems performing a variety of tasks given his stated physical concerns."  Id.  Further, Hoke has "mild difficulty making appropriate decisions . . . relating adequately with others . . . [and] dealing appropriately

with the normal stressors of life." Id. Hartman concluded that the results of the exam appeared consistent with psychiatric problems. Id. Hartman diagnosed Hoke with posttraumatic stress disorder; major depressive order, with recurrent episodes; and Cannabis dependence in partial remission. Id. at 6-7. Hartman issued a prognosis of "[f]air to guarded, given the multiple nature of symptoms." Id. at 7. In a medical source statement, Hartman concluded that Hoke's ability to understand, remember, and carry out instructions was affected by the impairment. Dkt. No. 9-27, at 8. He concluded that Hoke had no limitation on understanding and remembering simple instructions; mild limitation on carrying out simple instructions and making judgments on simple work-related decisions, interacting appropriately with the public, supervisors, coworkers, and responding appropriately to usual work situations and to changes in a routine work setting; and moderate difficulty in understanding and remembering complex instructions, carrying out complex instructions, making judgments on complex work-related decisions. Id.

### D. **Hoke's Complaints**

In a Function Report, Hoke stated that, before the onset of his alleged disability, he was able to "walk without stiffness or pain, legs locking up." Dkt. No. 9-6, at 16. He cooks simple meals for himself once a day, but his girlfriend largely cooks for him because he "can not [sic] stand for very long due to electronic shooting up legs and into both hips." Id. at 17-18. Hoke does the dishes; dresses, bathes, and grooms himself; and brings out the trash one bag at a time "due to leg pain and difficulty walking." Id. at 18. He can carry two grocery bags at a time. Id. at 20. He watches television and plays cards with friends up to three times per week. Id. at 19-20. He goes outside daily, walks, takes public transportation, and goes to the park twice

a week.  Id. at 18, 20.  He reported that he can walk three blocks or a quarter of a mile at a time

before he needed to stop and "flex legs due to pain" or rest for a few minutes.  Id. at 21-22.  He

also stated that driving is very uncomfortable for his right hip.  Id. at 21.  He "constantly" needs

to adjust his position when sitting, and has trouble going up stairs due to pain in his leg.  Id.

Hoke reported no difficulty relating to friends and family, following spoken or written

instructions, getting along with authority figures, or paying attention.  Id. at 20, 22

In his disability report, Hoke provided that he stopped working in October 2009 due to

the "end of the work season for construction," explaining that, "after this years [sic] work[,] there

has been no work for the last 2 years."  Dkt. No. 9-6, at 7.  He further stated he did not "think

[he] can work any more [sic] because of [his] leg, hip and the pain from these injuries."  Id.


## II. **Discussion**

### A.  **Standard of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the decision.

See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than

a mere scintilla," meaning that the record contains "'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  Halloran v. Barnhart, 362 F.3d 28,

31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

"In addition, an ALJ must set forth the crucial factors justifying his [or her] findings with

sufficient specificity to allow a court to determine whether substantial evidence supports the

decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing

Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, if the record contains substantial support for the ALJ's decision, a court cannot substitute its interpretation of the administrative record for that of the Commissioner.  See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  As long as the Commissioner's finding is supported by substantial evidence and there is no legal error, it is conclusive.  42 U.S.C § 405(g) (2006); Halloran, 362 F.3d at 31.

### B.  **Determination of Disability**[3]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006

---

[3]  Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec'y of Health and Human Servs. of the United States, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037

(2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to

determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

<u>Berry</u>, 675 F.2d at 467 (line spacing added); 20 C.F.R. §§ 404.1512(g); 404.1520(d), (e);

404.1525-.1526; 404.1545; 404.1560(b), (c); 404.1520(g); 404.1565; 404.920(d), (g);

416.912(g); 416.920(3); 416.960 (c); 416.965; 416.1520(f). The claimant bears the initial

burden of proof to establish the first four steps. <u>See</u> <u>DeChirico v. Callahan</u>, 134 F.3d 1177,

1179-80 (2d Cir. 1998) (citing <u>Berry</u>, 675 F.2d at 467). If the inquiry reaches the final step, the

burden shifts to the Commissioner to demonstrate that the claimant is still able to engage in

gainful employment.  Id. at 1180 (citing Berry, 675 F.2d at 467).


## C.  ALJ's Findings

Hoke, represented by counsel, testified at a hearing on November 27, 2012 before

ALJ Stephan.  Dkt. No. 9-2, at 31-50.  Using the test set forth in 20 C.F.R. § 404.1520, the

ALJ determined, as relevant here, that Hoke, (1) "meets the insured status requirements of

the Social Security Act through December 31, 2012"; (2) "has not engaged in substantial

gainful activity since January 1, 2010, the alleged onset date"; (3) "has the following severe

impairments: lumbar spine impairments, right hip trochanteric bursitis, major depressive

disorder, and anxiety disorders"; (4) "does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in

20 CFR Part 404, Subpart P, Appendix 1"; (5) "has the residual functional capacity to

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the

claimant can perform occasional climbing, stooping, or crouching, and is precluded from

crawling or kneeling; he can do simple, unskilled work, make simple work decisions, and

interact frequently with supervisors, coworkers, or the public"; (6) "is unable to perform any

past relevant work"; and (7) "has not been under a disability, as defined in the Social

Security Act, from January 1, 2010, through the date of this decision."  Id. at 19-26.

The ALJ concluded that Hoke's "allegations regarding his standing and walking

limitations are not consistent with the findings of the State agency consultative examiners or

the claimant's treating specialist, Dr. Hasan."  Dkt. No. 9-2, at 24.  Therefore, Hoke's

"allegations regarding his difficulty standing or ambulating are considered to not be credible

as they are not supported by the evidence." Id. The ALJ went on to conclude that Dr.

Hasan's report "show[s] that the claimant has some limitation for postural activities, and the

claimant's allegations in this area are considered to be generally credible." Id. at 25.

Further, the ALJ concluded that Hoke's "allegations regarding his mental impairments are

partially credible as the record shows that the claimant would have difficulty performing

complex work, but no significant impairment for carrying out simple work." Id. Thus, the

ALJ concluded that Hoke "can perform a range of unskilled light work, with limitations for

balancing, climbing, crouching, stooping, crawling, or kneeling, that involves frequent, but

not constant, interaction with others." Id. The ALJ went on to find that Hoke could not

perform his past work as a mason, but had the residual functional capacity to perform

unskilled light work. Id. at 26.


### D. **Hoke's Arguments**

Hoke contends that the ALJ committed reversible error: (1) "by failing to properly

assess [his] use of an assistive device"; (2) failing to call a vocational expert regarding his

nonexertional limitations; (3) "in his interpretation of [his] Global Assessment of Function

Score" ("GAF"); and (4) "in his credibility assessment," due to his failure to consider the

factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) and his steady work

history. Dkt. No. 11, at 1.


### 1. **Use of Cane**

Hoke argues that the ALJ failed to properly consider his need for an assistive device,

suggesting that the ALJ's determination that he has the residual functional capacity ("RFC") to perform light work is not supported by substantial evidence. Specifically, he contends that, in reaching his RFC, the ALJ (1) failed to consider his doctors' observations about his need for a cane and his lifting/carrying restrictions; (2) failed to properly consider his own testimony about his need for a cane; and (3) erred by declining to call a vocational expert to assess his need for a cane "coupled with [his] additional non-exertional limitations." Dkt. No. 11, at 3.

### i. **Medical Evidence About Need for Cane**

A treating physician's opinion on the nature and severity of a plaintiff's impairments will be given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); Halloran, 362 F.3d at 32. "Although the treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions of other medical records, 'not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician.'" Flagg v. Astrue, No. 11-CV-458 (LEK), 2012 WL 3886202, at *10 (N.D.N.Y. Sept. 6, 2012) (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)). If substantial evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and "the less consistent the opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (citation omitted). Moreover, as the ultimate conclusion whether a plaintiff is disabled and cannot work is reserved to the Commissioner (20 § C.F.R. 404.1527(e)(1)), "[a] treating physician's

statement that the claimant is disabled cannot itself be determinative." <u>Snell</u>, 177 F.3d at 133.

Should the ALJ decline to give controlling weight to a treating physician, he or she "must still consider various 'factors' in deciding how much weight to give the opinion." <u>Petrie v. Astrue</u>, 412 F. Appx. 401 (2d. Cir. 2011). The ALJ considers: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." <u>Schaal v. Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998); <u>see</u> 20 C.F.R. § 404.1527(c)(2). Where the ALJ rejects the treating physician's opinions or otherwise determines that they are not controlling, she must set forth her reasoning with specificity. 20 C.F.R. §§ 404.1527(c)(2); <u>see e.g.</u>, <u>Doyle v. Apfel</u>, 105 F. Supp. 2d 115, 119 (E.D.N.Y. 2000). An ALJ's "[f]ailure to provide [explicit] good reasons for not crediting a treating source's opinion is ground for remand." <u>McClaney v. Astrue</u>, No. 10-CV-5421 (JG/JO), 2012 WL 3777413, at *16 (quoting <u>Snell</u>, 177 F.3d at 134). However, "where the evidence of record permits [the court] to glean the rationale of an ALJs decision," the ALJ need not "have mentioned every item of testimony presented to him [or her] or have explained why he [or she] considered particular evidence unpersuasive or insufficient to lead him [or her] to a conclusion of disability." <u>Petrie</u>, 412 F. App'x. at 407. Ultimately, the final determination of disability and a claimant's ability to work rests with the Commissioner. <u>Id.</u> at 133-34; <u>see</u> 20 C.F.R. § 404.1527(e) (2005).

The Court disagrees with Hoke's contention that the ALJ did not properly consider Hoke's need for an assistive device. Dkt. No. 11, at 4. Hoke ventures the fact that "neither of [his] primary care physicians make note that the cane is not necessary" (Dkt. No. 11, at

4); however, Hoke's use of a double negative fails to mask the fact that the record lacks an opinion or finding from any medical provider concluding the cane was medically necessary.

First, the ALJ reviewed the statements from Hoke's providers, medical evidence in the record, and assessments from consultative examiners. In assessing Hoke's physical limitations, the ALJ gave "great weight" to the findings of plaintiff's treating provider. Dkt. No. 9-2, at 24. Hoke's treating physician, Dr. Hasan, concluded that Hoke had moderate limitations in walking, standing, sitting, lifting, carrying, pushing, pulling, bending, and climbing, and limited Hoke to lifting/pushing/pulling up to twenty pounds and standing or sitting for an hour at a time. Dkt. No. 9-7, at 45. Dr. Hasan also observed during an examination that Hoke "had a rather unsteady gait due to imbalance." Id. at 69. However, Dr. Hasan did not note whether Hoke used a cane during the examination or whether use of a cane was medically necessary. See id. The other only other medical opinion Hoke references to support his argument is that of Dr. Madala, plaintiff's podiatrist, who noted during a callous examination that Hoke ambulated with a cane and had moderate limitations in walking and standing. Dkt. No. 9-7, at 36, 47. However, Dr. Madala did not make any medical conclusions about Hoke's cane or balance, and medical records make clear that Dr. Madala's treatment of Hoke was limited to wart removal. Id.

Thus, although Hoke contends that the ALJ improperly failed to consider these findings in assessing whether a cane was medically necessary (Dkt. No. 11, at 3-4), the ALJ's RFC conclusion that Hoke can perform "unskilled light work, with limitations for balancing, climbing, crouching, stooping, crawling, or kneeling, that involves frequent, but not constant, interaction with others" is consistent with the RFC assessed by the plaintiffs' treating providers. Dkt. 9-2, at 25. Further, this RFC assessment is also consistent with the

findings of the consultative examiners, Dr. Corvalan and Dr. Malhoutra. As noted, Dr.

Corvalan examined Hoke and noted mild limitations on sitting and standing for long periods,

walking long distances, bending, squatting, climbing stairs, and kneeling and limited Hoke to

lifting/carrying up to ten pounds frequently and twenty pounds occasionally. Dkt. No. 9-27,

at 14. Dr. Corvalan concluded that it was unclear whether the cane was medically

necessary because Hoke used the cane inconsistently throughout the examination and

needed no assistance with rising from his chair or getting on and off of the examination

table. Id. at 12-13. Similarly, consultative examiner Dr. Malhotra noted that Hoke had full

range of motion in his lumbar spine; eighty degrees of hip flexion/extension, thirty degrees

interior rotation, forty degrees exterior rotation, 130 degrees of rotation in his right knee, and

150 degrees of rotation in his left knee; normal gait and station, and an ability to squat two-

thirds. Id. at 13. Dr. Mahotra concluded that Hoke had minimal limitation for bending his

right hip and knee and mild limitation in squatting. Id. at 14.

Therefore, the ALJ's conclusion that Hoke has mild limitations, that the cane is not

medically necessary, and that he has the capacity to perform light work is supported by

substantial evidence.

Hoke next suggests that the ALJ failed to properly consider his own testimony about

his use of, and need for, a cane (Dkt. No. 11, at 3-4); however, the ALJ did consider Hoke's

testimony about his need for a cane, but concluded that Hoke's statements were

inconsistent with the limitations proffered by treating physician Dr. Hasan and by the

consulting examiners. Dkt. No. 9-2, at 22, 24. The ALJ's assessment of Hoke's credibility

is entitled to great weight, and there is substantial evidence to support his conclusion that

the cane was not medically necessary. See, e.g., Marcus v. Califano, 615 F.2d 23, 27 (2d

Cir. 1979).  Accordingly, the ALJ's decision to discount Hoke's credibility as it relates to his medical need for a cane is supported by substantial evidence.

### ii. **Social Security Ruling 96-9p**

Finally, Hoke argues that although the cane is not prescribed, SSR 96-9p does not require a prescription for a cane to be considered medically necessary.  Further, Hoke contends that SSR 96-9p directs that an ALJ should consult a vocational expert to assess the impact of his need for a cane on his ability to perform light work. Dkt. No. 11, at 4-5.

Social Security Ruling ("SSR") 96-9p provides that there "must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which the assistive device is needed (i.e. whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information.)"  See SSR 96-9p, available at http://socialsecurity.gov/ OP_Home/rulings/di/01/SSR96-di-01.html (last visited Apr. 2, 2015).  SSR 96-9p further notes that, where there is a medically-required hand-held device, consultation of a vocational resource may be "especially helpful" in determining if/how the assistive device impacts a claimant's ability to work.

Although SRR 96-9p does not mandate that the hand-held assistive device be prescribed to be considered medically necessary, it does require specific medical documentation establishing its need and the circumstances surrounding its need.  See SSR 96-9p ("there *must* be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it

is needed.") (emphasis added). Hoke again proffers Dr. Hasan's observations that Hoke had moderate limitations in walking and standing and that he "had a rather unsteady gait due to imbalance" (Dkt. No. 9-7, at 69), and Dr. Madala's observation that he uses a cane and has moderate limitations in walking and standing (Id. at 36, 47). However, there is no medical evidence establishing the need for the cane; an observation by one physician that he used a cane and his podiatrist's note that he had an unsteady gait is not medical evidence establishing the need for the cane, as required under SRR 96-9p. See SRR 96-9p. There is similarly no evidence about "the circumstances for which [the cane] is needed," which is required by SSR 96-9p. Id.; see Miller v. Astrue, 538 F. Supp. 2d 641, 651 n.4 (S.D.N.Y. 2009) (concluding that the plaintiff's use of a cane did not factor into her ability to perform sedentary work where her treating physicians did not conclude that it was medically required and there was no evidence that she needed the cane at all times).

Testimony from a vocational expert was also not required by SSR 96-9p. SSR 96-9p states that "it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work" where the claimant "uses [a medically required hand-held device] for balance because of significant involvement of both lower extremities." SSR 96-9. Here, contrary to Hoke's argument, SSR 96-9p does not require vocational testimony, but merely suggests it as a consideration where a claimant with a medically-required assistive device is limited to sedentary, unskilled work. See 96-9p. Here, as there is no medical documentation in the record establishing the need for a hand-held assistive device, no vocational testimony was needed to assess whether Hoke's RFC may be less than what is required for a full range of light work.

Therefore, the ALJ properly considered Hoke's need for a cane in that he assessed

the medical findings and treatment notes from Hoke's treating physicians and the consultative examiners. The ALJ's determination on this matter is based upon substantial evidence.

### iii. **Vocational Expert Testimony on non-exertional impairments**

Next, Hoke argues that the ALJ erred in declining to call a vocational expert to testify about his nonexertional impairments and the effects of his nonexertional impairments on his residual functional capacity.[4] Dkt. No. 11, at 9-5.

Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability. Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996). In general, if a claimant suffers only from exertional impairments, then the Commissioner may satisfy his or her burden by resorting to the applicable rule of the Medical-Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid").[5] Id. at 39. The function of the Grids was succinctly summarized by the court in Zorilla v. Chater, 915 F.Supp. 662, 667 (S.D.N.Y. 1996) as follows:

> In meeting her burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part

---

[4] Although Hoke's counsel cites to "numerous nonexertional impairments that Mr. Hoke has in addition to needing a cane for balance," he fails to specify the nonexertional impairments to which he is referring. Dkt. No. 11 at 5.

[5] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); see also Rodriguez v. Apfel, 06-CV-8330 (JGK), 1998 WL 150981, at *10, n.12 (S.D.N.Y. March 31, 1998).

404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)". Id. at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App.2).

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids.[6] Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir.1986). The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations-so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." Id. The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to

---

[6] A "nonexertional limitation," or a "non-strength limitation" (Samuels v. Barnhart, 01-CV-3661 (MBM), 2003 WL 21108321, at *11 (S.D.N.Y. May 13, 2003)), is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); see also Rodriguez, 1998 WL 150981, at *10, n.12.

-23-

deprive him of a meaningful employment opportunity." Id. at 606. Under these circumstances, to satisfy her burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (quoting Bapp, 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider whether the range of work the plaintiff could perform was so significantly diminished by nonexertional limitations as to require the introduction of vocational testimony. Samuels, 2003 WL 21108321, at *12 (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the grids).

Here, Bapp does not require a contrary result. The ALJ did not conclude that Hoke suffered from nonexertional impairments that "significantly diminished his ability to work -- over and above any incapacity caused solely from exertional limitations." Id. Instead, the ALJ considered Hoke's mental limitations and concluded that the record demonstrated that Hoke's mental impairments would cause him "difficulty performing complex work, but no significant impairment for carrying out simple work." Dkt. No. 9-2, at 25. The ALJ also considered Hoke's limitations on "postural activities" and incorporated them into his RFC by setting forth limitations on balancing, climbing, crouching, stooping, crawling, or kneeling." Id. Thus, because the ALJ properly considered Hoke's nonexertional limitations but did not find that they "significantly diminished his ability to work," testimony of a vocational expert regarding nonexertional impairments was not needed, and the ALJ could properly rely on the grid to assess Hoke's RFC. See generally Dumas, 712 F.2d at 1544 n.4 ("Because there was

substantial evidence to support the Secretary's conclusion that [the plaintiff] retained the [RFC] for sedentary work, the ALJ rightly removed that issue from the vocational expert's consideration.").

## 2. **GAF Score**

Hoke argues that the ALJ "erred in his interpretation" of his GAF Score. Dkt. No. 11, at 5. Specifically, Hoke contends that the ALJ "improperly uses a GAF score to discredit the opinion of Mr. Hoke's mental health counselor." Id. Hoke opines that a GAF score should not be considered or should be given little weight because the Diagnostic Statistic and Diagnostic Manual of Mental Disorders ("DSM-5") no longer includes GAF ratings for mental disorders and the American Psychiatric Association recommended that GAF ratings be dropped from the DSM-5 "for several reasons, including its conceptual lack of clarity." Dkt. No. 11, at 6. He also contends that GAF scores should be considered opinion evidence at most, as the SSA's Administrative Message AM-13066 states that, although GAF scores may be considered by ALJs, they should be treated as opinion evidence "and should not be dispositive of the severity of an impairment." Id. at 7. The Commissioner asserts that the ALJ's determination is supported by substantial record evidence, and that he assigned proper weight to Mr. Sadal's opinion in reaching his RFC determination. Dkt. No. 13, at 17. The undersigned agrees with the Commissioner.

"The GAF is a scale promulgated by the American Psychiatric Association to assist in tracking the clinical progress of individuals [with psychological problems] in global terms." Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (internal

quotation marks omitted). An ALJ may properly consider, among other information, whether a treating source's opinion is consistent with the GAF scores assessed by that treating source. See, e.g., Blasco v. Commissioner of Soc. Sec., 13-CV-576 (GLS), 2014 WL 3778997, at *5 (N.D.N.Y. July 31, 2014) (finding that ALJ properly discounted treating physician's opinion that the plaintiff suffered marked restrictions of daily living and extreme difficulty in maintaining social function where the doctor's treatment relationship with the plaintiff was unclear, and the plaintiff's GAF was 65, indicating mild symptoms).

Here, Hoke's GAF score, as assessed by Vitality Physicians Group – the practice where he was treated by Mr. Sadal – tested between 65 and 70, which indicates mild impairments. Dkt. No. 9-23, at 2, 5. However, as noted, Mr. Sadal opined that Hoke was "very limited" in his ability to interact appropriately with others, maintain socially-appropriate behavior, maintain basic standards of personal hygiene, and function at work at a consistent pace. Dkt. No. 9-7, at 45. The ALJ assigned "little weight" to this assessment, concluding it "is not supported by the record, including [Mr. Sadal's] own treatment reports." Dkt. No. 9-2, at 24.

Addressing Hoke's argument that the ALJ erred in relying on the GAF scores, the Court observes that AM-13066 has an effective date of July 22, 2013, which is several months after the ALJ rendered his opinion in this case. See Garcia v. Colvin, 13-CV-6433P, 2015 WL 1280620, at *7 n.6 (W.D.N.Y. Mar. 20, 2015) (citing Holloman v. Colvin, 13-CV-3804, 2014 WL 5090030, *7 (E.D. Pa. 2014) ("[t]o the extent that AM-13066 changed the weight an ALJ may accord to GAF evidence, [the plaintiff] has provided no evidence that the 2013 policy applies retroactively to the ALJ's 2012

decision[;] . . . changes in the SSA regulations and corresponding policies typically apply only in cases decided after the enactment of the changed regulation and/or policy.")). Hoke presents no evidence that AM-13066 is retroactive in nature. See id. Further, as the Commissioner points out, and the undersigned takes judicial notice of, DSM-5 was released in 2013, after Mr. Sadal's examinations and notes in the record. Thus, the ALJ did not err in considering the GAF score.

Regardless of the proper weight to be assigned to a GAF score, the ALJ did not base his assessment of Hoke's mental limitations entirely on the GAF score, rather he assessed the medical evidence in the record. First, the undersigned notes that the ALJ was not required to give controlling weight to the opinion of Mr. Sadal, a physician's assistant, as he does not qualify as a "medical opinion" under 20 C.F.R § 404.1513(a). Thus, the ALJ had "the discretion to determine the appropriate weight to accord the [therapist's] opinion based on all of the evidence before him." Diaz v. Shalala, 59 F.3d 307, 316 (2d Cir. 1995). The ALJ considered the findings of the Mr. Sadal and concluded that they were unsupported by his treatment records. Dkt. No. 9-2, at 24. As the ALJ noted, and the Commissioner expands upon (Dkt. No. 13, at 16), records from Vitality Physicians regarding Hoke's mental health treatment do not support the significant limitations opined by Mr. Sadal in his assessment of Hoke's RFC. Indeed, there are no treatment notes, clinical evidence, or other findings supporting Mr. Sadal's conclusion that Hoke is very limited in his ability to interact with others, maintain socially-appropriate behavior, maintain basic standards of hygiene and grooming, and function in a work setting at a consistent pace; and moderately limited in his ability to understand/remember/carry out instructions, maintain

attention/concentration, and make simple decisions. Dkt. No. 9-7, at 45. The record instead contains treatment notes from Mr. Sadal's colleague, Allison Pawlik, LMSW, which indicate that Hoke presented as depressed, that his functional status was intact, his behavior appropriate, judgment good, thought content normal, memory in tact, and dress appropriate. Dkt. No. 9-23, at 2; 9-25, at 2. Ms. Pawlik's findings of appropriate behavior and judgment, as well as appropriate dress, conflict with Mr. Sadal's assessment of these limitations. Dkt. No. 9-7, at 45; Dkt. No. 9-23, at 2; 9-25, at 2. Similarly, Hoke himself reported that he did not have any limitations on dressing and bathing himself, interacting with friends, following spoken or written instructions, or getting along with people in authority positions. Dkt. No. 9-6, at 16, 20, 22. Further, Mr. Sadal's findings conflict with those of consultative examiner Dr. Brett Hartman, Psy.D., who concluded that Hoke had only mildly-impaired attention and a mild limitation for simple work, interacting with others, and responding appropriately to usual work situations and changes in work setting, and a moderate limitation for complex work. Dkt. No. 9-7, at 6-7.

Thus, the ALJ did not err in considering Hoke's GAF score in assessing his mental limitations. As the ALJ's assessment of Hoke's mental limitations is based on substantial evidence, it is recommended that Hoke's request to remand on this issue be denied.

### 3. **Credibility**

Hoke argues that the ALJ "failed to apply the correct legal standard in assessing [his] subjective complaints of pain; therefore, his RFC analysis is unsupported by

substantial evidence." Dkt. No. 11, at 7. Specifically, he contends that the ALJ failed to: (1) assess factors set forth in 20 C.F.R § 404.1529(c)(3), such as his daily activities, frequency of symptoms, or his medication and other measures taken to alleviate pain; and (2) take into account his strong work history in making his credibility assessment. Dkt. No. 11, at 7-8.

When the evidence demonstrates a medically-determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]" Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.1979). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." Casino-Ortiz v. Astrue, 06-CV-155 (DAB/JCF), 2007 WL 2745704, at *11, n.21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)). However,

> [a]n administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.

Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y.1999) (internal citations omitted).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the plaintiff's ability to engage in substantial gainful employment. See Marcus, 615 F.2d at 27. Where an ALJ determines that a plaintiff's complaints of pain are unsupported by objective medical evidence, the ALJ must then consider

several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;

> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

> (iii) Precipitating and aggravating factors;

> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

However, "disability requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Id.  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." Snell, 177 F.3d at 135 (citing Donato v. Sec'y of Dept. of Health and Human Services of U.S., 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence. Aponte v. Sec'y of Health and Human Services of U.S., 728 F.2d 588, 591 (2d Cir.

1984).  That the ALJ "has the benefit of directly observing a claimant's demeanor and other indica of credibility . . . entitles the ALJ's credibility assessment to deference." Schlichting v. Astrue, 11 F. Supp. 3d 190 (N.D.N.Y. 2012) (quoting Tejada v. Apfel, 167 F.3d 770, 770 (2d Cir. 1999)).

### i. **Factors under 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)**

Here, the ALJ concluded that Hoke's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  Dkt. No. 9-2, at 22.  The ALJ thereafter discussed his rationale behind his credibility determination.  Specifically, the ALJ noted that: (1)  Hoke reported that he stopped working in October 2009 because he was laid off "and that 'there has been no work for the last 2 years,' which is consistent with the claimant looking for work during that time"; (2) Hoke did not seek treatment for right leg pain until November 2011, when he saw Dr. Madala and reported that DSS told him he needed a primary care physician to see him about his right leg pain, "suggest[ing] that the claimant was simply seeking treatment to build his document record rather than legitimately seeking treatment for his reported right leg pain"; (3) consulting examiners Dr. Corvalan and Dr. Malhotra expressed doubts about his medical need for a cane; (4) Dr. Malhotra concluded that Hoke had full range of motion in his lumbar spine, normal gait and station, minimal limitation for pending his right hip and right knee, and mild limitation in squatting; (5) treating physician Dr. Hasan concluded that Hoke had the RFC to lift/carry up to ten

pounds frequently and twenty pounds occasionally, sit, stand, or walk for six hours each in an eight-hour work day, up to one hour at a time, and occasionally climb ladders, scaffords, kneel, or crawl. Id. at 22-24. The ALJ further concluded that Hoke's complaints regarding his difficulty standing and ambulating were not credible because they were not supported by the evidence. Dkt. No. 9-2, at 23.

Further, in making his determination, the ALJ properly assessed Hoke's activities of daily living, noting that Hoke reported that he could "tend to his personal hygiene, prepare simple meals, wash dishes, bring out the garbage, handle money, use public transportation, and travel independently." Dkt. No. 9-2, at 20. The ALJ concluded that Hoke's physical impairments caused mild restriction on his activities of daily living. Id. The ALJ also addressed Hoke's alleged mental disabilities and concluded that they, too, imposed mild limitations on his activities of daily living. Id. Further, the ALJ considered Hoke's testimony relating to his aggravating factors and the measures taken to relive the pain – such as taking breaks when walking. Id. at 22. The ALJ also considered the treatment Hoke obtained for his pain/symptoms by noting that he visited Dr. Madala for a triage visit to address right leg pain and, upon the visit, told Dr. Madala that he was told he needed to see a doctor for that issue, according to DSS. Id. He also noted that Hoke visited Dr. Alfred with complaints of right hip, left leg, and low back pain and underwent a series of epidural steroid injections. Id. at 23.

Therefore, the ALJ properly considered the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

ii. **Work History**

-32-

Hoke asserts that the ALJ failed to take his strong work history into account when considering his credibility. "To be sure, 'a good work history may be deemed probative of credibility"; however, it is "just one of many factors" to be considered when assessing a plaintiff's credibility. Carvey v. Astrue, 380 F. App'x 50, 53 (2d Cir. 2010); Schaal, 134 F.3d at 502. As work history is just one of many factors an ALJ is to consider in assessing credibility, where the ALJ bases his or her credibility decision on other relevant factors, the ALJ's "decision not to rely exclusively on [the plaintiff]'s good work history was . . . not erroneous." Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (citing Wavercak v. Astrue, 420 Fed. App'x 91, 94 (2d Cir. 2011) (unpublished summary order).

Here, although the decision is devoid of a discussion of how Hoke's fourteen years of employment in this role impacted the ALJ's credibility determination, as pointed out by the Commissioner, the ALJ noted that Hoke had past work as a brick mason and that he "was insured for DIB through December 2012, which indicates that he was aware of plaintiff's work history." Dkt. No. 9-2, at 25; Dkt. No. 13, at 19. In Wavercak v. Astrue, the Second Circuit concluded that, even where good work history is not specifically referenced in an ALJ's determination, that ALJ "considered [the applicant's work history] in the disability analysis when he concluded that [the applicant's] RFC for light work prevented him from performing the medium demands of his past warehouse work" indicated that the ALJ did not fail to consider the plaintiff's work history in making a credibility determination. 420 Fed. App'x at 94; see also Campbell 465 Fed. App'x at *6; Medovich v. Colvin, 13-CV-1244 (GLS/ESH), 2013 WL 1310310, at *13 (N.D.N.Y. Mar. 23, 2015) ("Work history . . . is not one of the seven

-33-

evaluative factors prescribed by the regulation. Nor is there authority suggesting that

good work history trumps other valid reasons for partially discrediting subjective

testimony.")

Thus, because the ALJ relied on several appropriate factors in making his

determination, any failure to rely on this work history is not reversible error, given the

that the ALJ's credibility determination is supported by substantial evidence.

Wavercak, 420 F. App'x at 94; see also Swartz v. Comm'r of Social Sec., 13-CV-5962

(LGS), 2015 WL 220983, at *10 (S.D.N.Y. Jan. 13, 2015).

Accordingly, it is recommended that Hoke's request to remand on this issue be

denied.


### III.  **Conclusion**

For the reasons stated above, it is hereby  **RECOMMENDED** that the

Commissioner's decision denying disability benefits be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to

the foregoing report. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.

1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C.

§636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).


Dated: April 17, 2015
Albany, New York

*Christian F. Hummel*

Christian F. Hummel
U.S. Magistrate Judge